### BENJAMIN RAITZ v. EMMA B. GREEN.

LIABILITY OF THE CHIEF OF POLICE FOR FALSE IMPRISONMENT.

In an action for false imprisonment against the chief of police by a person who had been arrested and imprisoned by the order of the chief without any affidavit being filed or any warrant issued, the arrest and imprisonment being made on Saturday, and on Monday the hearing was to take place in the police court, but owing to a riot in the city which called the chief away, together with the officers who made the arrest, whereupon the prisoner instituted *habeas corpus* proceedings and was discharged, and afterwards commenced this action *Held*, that the officer did not himself cause an affidavit to be filed; that it was reversible error for the trial court to charge the jury in substance that the chief was guilty of unreasonable delay in making these affidavits, and that inasmuch as he did not even under the circumstances, file the affidavits Monday morning, so that the prisoner would from that time have been legally detained on a warrant, that he was guilty of unlawfully imprisoning the accused and that, therefore, he was guilty of unreasonable delay, which rendered him liable to prosecution for unlawful imprisonment.

ERROR.

HAYNES, J.

The petition in error in this case is filed for the purpose of reversing the judgment of the court of common pleas in an action that was brought in that court, wherein Emma B. Green was plaintiff and Benjamin Raitz defendant with other parties at that time.

The question that is submitted to us arises upon the charge of the court, and is a question affecting the rights and liabilities of Raitz as chief of the police force, or as an officer charged with the preservation of the peace, order and law of the city of Toledo.

Raitz v Green.

The plaintiff in the petition below stated that she was arrested by the order of Raitz without any affidavit being filed or any warrant issued, and was imprisoned for the space of fifty-six hours in the city prison. The testimony shows this state of facts: That parties on the limits of the city were complaining and did complain on the morning of the 7th of July, 1894, which was Saturday—and it came from two or three different sources —that at least buildings of three different persons had been broken into and relieved of some of their contents, which consisted of chickens. Raitz sent out two of his officers to make an investigation. They went out into the neighborhood, and commenced their researches, and discovered such facts as that they charged this woman, her husband and daughter, of having been guilty of stealing the chickens. Both Mr. and Mrs. Green offered to come to town with the officers, and did come with them, and perhaps the daughter. After they arrived here, they went into the office of the chief, and he had a long conversation with them, and the result of the investigation was that sometime during the afternoon, perhaps between one and two o'clock, he ordered them to be locked up, and then himself went out to the premises during the afternoon or early evening and made further investigations, and found feathers and entrails of chickens buried, and ascertained from different sources that these parties not only had had chickens in their possession, but had been selling them to hotels in this city. The next morning—Sunday—on his arrival at the station, he was informed that Mrs. Green wanted to see him. He accordingly directed that she be brought up to the office of the chief. Mrs. Green then told Raitz, the chief, that she never had been in any trouble before, and was of a respectable family; and she proceeded to state to him that she and her husband on the night in question started from a residence in North Toledo, got out in the western part of the city, where they stopped. She and her daughter remained in the wagon for quite a while, and her husband went away, and came back heavily laden, in his arms and across his back, with chickens, all dead. They were loaded into the wagon, and taken back to their residence in North Toledo, and dressed that night, and the next morning they were brought to town and sold. It was in evidence that they owned no chickens, and never kept any themselves. There was other evidence of facts which had been brought before Raitz, with regard to where the heads of chickens had been found. Upon that state of facts, during the day the chief sent word to the parties to whom the chickens belonged which had been stolen, to come on early on Monday morning to make their affidavits, so that the cases could be heard in police court that morning. On that morning—the 9th of July—about seven o'clock, the chief received information that there was a riot in progress somewhere in the neighborhood of Air Line Junction; that matters were very serious and demanded his immediate attention. He thereupon called out certain of the reserves, and started for the Junction, and remained there during the whole of that day, or at least until about five o'clock. He was engaged during the balance of the week out there in the line of his official duties, with the force under his command, in preserving order and maintaining the laws. When he returned on Monday afternoon at five o'clock, he was told that a writ of *habeas corpus* had been left for him to produce the body of these persons before the probate judge. Raitz found that the officers who had charge of the prison had taken them over to the probate court. He started for the probate judge's office, and arrived there just as the Greens were being discharged. The chief had none of his officers with

him who had made the investigations into the charges upon which the Greens had been arrested. They were engaged in the line of their duties at Air Line Junction. So the prisoners were discharged. Thereupon Emma B. Green commenced this action against the chief. The case proceeded to trial. Testimony was given setting out all of these facts, and the court proceeded to give his charge. He says:

"It appears in the evidence uncontradicted that the plaintiff here was brought to the station house in the afternoon of Saturday. The next morning being Sunday, there could be no session of the police court on that morning, but in the absence of proof to the contrary, it will be presumed that there was such a session on the next Monday morning; and the defendants, under this rule, were only authorized to detain the plaintiff from the time on Saturday when she was at the station house, whether brought there by the officers, Nichter and Ashby, or whether there voluntarily, until the next session of the police court."

Referring to some rules of the police board for the government of the police force.

"I say to you as a matter of law that her detention after that time without warrant, and without producing her to the court upon Monday morning—not producing her there until she had been released by the probate court—was without warrant of law and illegal, and that, too, whether she was in the first place properly arrested or not, or whether she was before that time legally or illegally detained, under the rules of law which I have given you and upon the evidence before you. And the plaintiff having been thus arrested without warrant, I say to you farther, that the burden of proof is upon the defendants to show such a state of facts as justified the officers in making the arrest without the warrant, and also that they did not detain the arrested party an unreasonable length of time before the issuing of a legal warrant; and whether the circumstances stated afforded the defendants reasonable grounds to suppose that the plaintiff had committed a felony, or whether the circumstances justified the detention of the plaintiff, and for how long a time it justified the detention, are to be judged by you upon the evidence; except as I say, that under the rules of law, which I have given you, the defendants or either of them were not justified in holding the plaintiff in custody without warrant after the session of the court upon Monday morning.
*　　*　　*　　*　　*

"Defendant Raitz, as chief of police, admits that he did arrest her at the station house and that she was detained under his orders until released on the following Monday, and that he detained her without warrant. You will therefore, for these reasons, find that, so far as he is concerned, this arrest was illegal and that this detention was illegal. But if you do not find that she was arrested by Nichter and Ashby, and that they did not, as I say, participate in her subsequent arrest or detention, then they or either of them would not be liable; but if while they were together and acting in concert either arrested her, the other would be equally liable with the one with whom he was acting in concert."

With all respect to the learned court who delivered this charge, we are unable to agree with him as to its correctness. The statute provides—and to that he did not refer the jury—sec. 7129, that,

"A sheriff, deputy sheriff, constable, marshal or deputy marshal, watchman, or police officer, shall arrest and detain any person found violating any law of this state, or any legal ordinance of a city or village, until a legal warrant can be obtained."

It is conceded that so far as the officer was concerned, these persons were not then found by him committing an offense.

"Sec. 7130. When a felony has been committed any person may, without warrant, arrest another who he believes and has reasonable cause to believe, is guilty of the offense, and may detain him until a legal warrant can be obtained."

It is sufficient to say under the facts as detailed by the witness, if the facts were true that an offense had been committed, that the officer was justified in acting under this section of the statute, if he kept himself within its proper limits. He was arresting a person whom he believed, and had reasonable cause to believe was guilty of the offense, and he could detain him until a legal warrant could be obtained. The police court is a court of record, and has authority to hear and determine all offenses against the ordinances of the city; in certain cases it has the right to hear and determine finally offenses against the laws of the state; and it has the same right as a magistrate to hear and determine as an examining magistrate whether a felony has been committed, and to bind the party over to the proper court for a hearing of the case. It has a judge and a prosecuting attorney, who is required to prosecute all actions before that court for all offenses.

Such being the condition of affairs the chief, on Saturday, upon what he considered to be sufficient evidence, and which we have no doubt was sufficient evidence to authorize him, ordered this woman to be detained and brought before the court on Monday. Under the charge of the court no real objection was taken to that. He was acting as the court finds within the proper limits of his authority. On Monday morning the court would be in session, and the chief had then taken steps to have these respective parties present to prosecute that suit—to make affidavits, which, we suppose, were all to be prepared by the prosecuting attorney; or if it was a misdemeanor, it might be brought by an information. In the line of his duty the officer is called away upon matters of the gravest importance; but he has put in operation the machinery of the law; he has the person detained, he is to have the witnesses here, he knows the prosecutor and the duties he has to perform. We think he had a right to suppose that those duties would be performed in the due and ordinary course of business, and that he was not bound to leave those other and more weighty matters, and remain here for the purpose of prosecuting this suit, or to see that the affidavits were filed that morning. At any rate, we are clearly of the opinion that the question should have been submitted to the jury, on all these facts, to determine whether he had been guilty of unreasonable delay in making these affidavits, or of unreasonable delay in the omission of any duty which he was called upon to perform in regard to this matter, and let the jury say whether he had been thus guilty; but the court proceeded to charge as a matter of law, that inasmuch as he did not, even under these circumstances before the court, file the affidavit that morning, so that the person would from that time have been detained on a warrant, that he was guilty of unlawfully imprisoning these persons; in other words, he was guilty of unreasonable delay, which rendered him liable to a prosecution for unlawful imprisonment. We do not agree with the court in the view it took of the law in regard to the case. For this reason we shall reverse the judgment

Dec. 16

of the court, set aside the verdict and remand the case to the court of common pleas for a new trial.

*F. M. Sala*, for Plaintiff in Error.

*J. A. Jones* and *M. B. Lemmon* for Defendant in Error.

---

# JUDGMENT—PRACTICE.